IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CONOCOPHILLIPS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CV-281-WKW [WO] |
| | ) | |
| SOUTHEASTERN ENERGY, | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2004, Southeastern Energy Corporation ("Southeastern") ceased distributing ConocoPhillips Company's ("CP") brands at Southeastern's gas retail facilities in Alabama and Georgia.  CP sued Southeastern for breach of contract.[1]  CP alleges that because Southeastern debranded from CP brands in violation of its contract, Southeastern owes CP monies extended as part of incentive payment programs.  Southeastern answered with several defenses and counterclaims (Am. Answer (Doc. # 13)), and CP moved for summary judgment on all claims and counterclaims (Doc. # 34).[2]  After oral argument, the court granted summary judgment in favor of CP on claims related to two of the four gas retail facilities at issue.  (Doc. # 51.)  Remaining are CP's claims as to the other two facilities, and Southeastern's counterclaims.  Based upon careful consideration of the arguments of counsel,

---

[1] CP also sued the following individual Defendants whose claims completely overlap with Southeastern's: Crystal G. Pitts, Martha J. Pitts, Jack R. Pitts, and Thomas M. Pitts.  These individual Defendants joined Southeastern in its pleadings and filings.

[2] CP filed a supporting memorandum of law (Doc. # 35) and evidentiary submission (Doc. # 36).

the relevant law, and the record as a whole, CP's motion for summary judgment (Doc. # 34) is due to be denied as to CP's remaining claims but granted as to Southeastern's counterclaims.

# I.  JURISDICTION

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. § 1332.  The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

# II.  FACTS AND PROCEDURAL BACKGROUND[3]

In the 1990s, Southeastern and CP entered into a Petroleum Marketer Agreement ("PMA"), the most recent renewal of which was in April 2002.[4]  (PMA (Pl.'s Evidentiary Submission Ex. 2).)[5]  Under the PMA, CP sold petroleum products to Southeastern. Southeastern entered into the PMA as part of its plan to convert from the Phillips brand, which Southeastern had determined was "worthless."  (See Jack Pitts Dep. 46 (Pl.'s

---

[3] The facts, given in detail below, can be summarized in this way.  Southeastern razed and rebuilt two stores based, it says, on Conoco Inc.'s ("Conoco") insistence and on financial incentives provided by Conoco to offset the cost of rebuilding.  If Southeastern kept the Conoco brand for a period of years, the money it "advanced" Southeastern would, in effect, be forgiven.  If Southeastern debranded from Conoco during that period, however, Southeastern would have to pay the incentive money back.  Subsequent to the agreement, Conoco merged with Phillips Petroleum Company ("Phillips") to form CP, and the new company made public a plan to rebrand Conoco to Phillips in the southeast, which CP claims it had a contractual right to do.  Southeastern did not like the Phillips brand, and did not buy into CP's reasons for changing.  Southeastern also did not want to agree to change other terms of its arrangement with CP. Southeastern therefore debranded from Conoco, and refused to repay the incentive money.  CP eventually decided, however, to not implement the new plan.  The suit is an attempt by CP to recover the incentive money for the two stores.

[4] The opinion will refer to Conoco as CP except where the distinction matters.

[5] Record citations are selectively provided for disputed facts.

Evidentiary Submission Ex. 1 (Doc. # 36); Def.'s Evidentiary Submission Ex. 1 (Doc. # 40)).)[6]

Facility Action Request forms ("FARs") governed the agreements between the parties for actions concerning particular stores.  By their terms, the FARs amended and became attached to and part of the umbrella PMA.  (*See, e.g.*, Lincoln FAR (Pl.'s Evidentiary Submission Ex. 3).)  At issue in this case are four FARs, signed by Southeastern, amending the parties' PMA.[7]  Signed in December 2000, the FAR governing the facility in Lincoln, Alabama, implemented a special incentive program whereby CP provided Southeastern with incentive payments for rebuilding that facility.[8]  The incentive program provided for CP to pay Southeastern three cents per gallon over four years, with an up-front payment, and a final payment at the end of three years, and a half-cent increase for volume over a projected amount.  The FAR governing the Auburn, Alabama facility, signed in April 2001, implemented the same special incentive program.  (Auburn FAR (Pl.'s Evidentiary Submission Ex. 8).)  These special incentive programs offered terms more favorable to

---

[6] Both deposition submissions are cited because the parties submitted different pages of the deposition.

[7] FARs that attached before the most recent renewal of the PMA were subsumed into it.  (PMA ¶ 7.C.)

[8] The parties dispute whether Southeastern decided to raze and rebuild its Lincoln facility before the parties contemplated this agreement.  All that an earlier FAR from February 2000 shows, however, is that the facility was scheduled to be razed and rebuilt by the end of 2000 (Prior Lincoln FAR (Pl.'s Evidentiary Submission Ex. 5), which was when Southeastern signed the FAR at issue (Lincoln FAR).

3

Southeastern than those in incentive programs governing other facilities, including those in

LaGrange, Georgia, and Anniston, Alabama, formerly at issue in this suit.[9]

The PMA reserves for CP "the right at any time to change its product line and

specifications, trade dress, trade names, and trademarks."[10]  (PMA ¶ 4.I.)  It also states that:

> In the event of such change, [CP] shall be relieved of all obligation to sell such
> discontinued product, etc., to Marketer; and if [CP] shall market any other
> brand or product in lieu of the discontinued items, [the PMA] shall embrace
> such new brands and products.  [CP] shall not be liable to Marketer by reason
> of any such changes.

(PMA ¶ 4.I.)  The FARs separately require marketers to acknowledge that "all funds paid to

Marketer by [CP] for the purpose of branding units are subject to amortized repayment to

[CP] in the event of debranding."  (Lincoln & Auburn FARs.)

Conoco and Phillips merged in 2002 to form CP.  In 2003, CP announced and began

promoting a new marketing program that would eliminate Conoco products in the southeast

and rebrand facilities with the Phillips brand.  (*See, e.g.*, Pitts Aff. 4 (Def.'s Evidentiary

Submission Ex. 4).)  Ultimately, CP dropped the new marketing plan.[11]  The parties dispute

what happened between the merger and when the plan was dropped, but what is certain is

that some time in 2004, Southeastern debranded from CP products (Pitts Dep. 160-61).  In

his affidavit, Jack Pitts, the President and CEO of Southeastern, recalls that he ordered

---

[9] The claims for these facilities have been resolved.

[10] When a supplier, in this case CP, changes brands, it is referred to as "rebranding."  When a marketer like Southeastern abandons a brand, that is referred to as "debranding."

[11] Kyle Parks, a CP representative and employee, testified that he finally convinced CP to allow dual branding in the southeast some time in 2004.  (Parks Dep. 53, Dec. 16, 2008 (Pl.'s Evidentiary Submission Ex. 12; Def.'s Evidentiary Submission Ex. 2).)

Southeastern to debrand after Kyle Parks, a CP representative and employee, told him that there was no turning back from the new marketing plan and that Southeastern would be required to rebrand to Phillips.  (Pitts Aff. 6; Pitts Dep. 80.)

According to Pitts, the rebranding was not palatable to Southeastern for several reasons: (1) Southeastern had spent time and money debranding from Phillips as part of its transition to Conoco's brands, and, under CP's new marketing plan, Southeastern would have been required to market Phillips again without much help promoting the brand from CP; (2) the rebranding would be at Southeastern's expense;[12] and, importantly (3) the rebranding required Southeastern to give up the special incentive programs it had negotiated with CP and to accept a new payment program.  (Pitts Aff. 4-5.)  The rebranding process required marketers to sign a new Marketer Service Allowance ("MSA").  The MSA would have substituted new payment terms for the FARs' special incentive programs.  (Parks Dep. 20-21, Dec. 16, 2008 (Pl.'s Evidentiary Submission Ex. 12; Def.'s Evidentiary Submission Ex. 2); Pitts Dep. 83.)  Parks testified that although CP under the new plan would have provided a shortfall mechanism for bridging the difference between old and new payment terms, it was his opinion that Southeastern would not have received less money under the new plan and, by implication, could not have taken advantage of the shortfall mechanism.  (Parks Dep. 20-21.)  Pitts contends otherwise.  In his opinion, the monies Southeastern would have received

---

[12] *See also United Energy Distribs. Inc. v. ConocoPhillips Co.*, No. 1:07-cv-2644, 2008 WL 4458991, at *2 (D.S.C. Sept. 30, 2008) (in suit against CP related to the same national marketing plan, court stated that when CP rolled out the new plan, it expected distributors to pay the cost of re-imaging, though CP offered financial incentives to offset that cost).

under the MSA were a "fraction" of what Southeastern was receiving under the special incentive program for the Lincoln and Auburn facilities.  (Pitts Aff. 6-7; Pitts Dep. 68-71, 85.)  He argues that Southeastern built the new facilities only because CP encouraged Southeastern to build bigger stores (Pitts Dep. 64-67) and offered more favorable incentive programs to finance them (Pitts Dep. 123, 125-26).

After Southeastern debranded from CP products, CP filed suit in April 2008 for breach of contract to recover the unamortized monies, totaling $425,381.45, Southeastern received pursuant to the PMA and FARs for the Lincoln, Auburn, LaGrange, and Anniston facilities.  (Compl. ¶¶ 15, 18 (Doc. # 1).)[13]  In its amended answer, Southeastern denied that CP was entitled to any recovery and asserted affirmative defenses.  (Am. Answer 1-3.) Southeastern also counterclaimed for fraudulent suppression, fraud in the inducement, estoppel, and a violation of the Petroleum Marketing Practices Act ("PMPA").  (Am. Answer 3-11.)  In January, CP moved for summary judgment on its claims and Southeastern's counterclaims.  Southeastern filed a response in opposition (Doc. # 39), with a supporting evidentiary submission, and CP replied (Doc. # 45).   In response to CP's request (Doc. # 45), oral argument on the summary judgment motion was held on May 6, 2009.  (*See* Doc. # 46.)  After oral argument, summary judgment was granted by written order in favor of CP

---

[13] Southeastern also sued for interest, costs, and reasonable attorney's fees.  (*See* Compl. ¶ 18.)

on the claims and counterclaims for the LaGrange and Anniston facilities (Opinion (Doc. # 51)).[14]

In support of summary judgment, CP argues (1) that the FARs require repayment of funds because Southeastern debranded; and (2) that Southeastern has presented insufficient evidence to support its counterclaims.  Southeastern counters that it was CP that forced debranding by failing to satisfy its obligations under the FARs, and that CP therefore cannot justly require repayment.[15]  In reply, CP accuses Southeastern of breaching first by prematurely debranding, but it also argues that, regardless, repayment is due *irrespective* of which company breached first because of the clear contract terms – the repayment clause includes no exceptions.  CP adds that Southeastern's refusal to repay funds for just two of the four facilities is inconsistent as the debranding repayment provision was standard to all four FARs.  Finally, CP asserts that the PMPA claim fails because rebranding does not amount to market withdrawal.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

---

[14] The ruling explicitly provided no opinion "as to the contractual obligations governing [either location]" and instructed the parties not to interpret it as affecting the claims on the other facilities. (Opinion 2.)

[15] Southeastern also argues that the PMA is a contract of adhesion.  In its reply, CP contends that adhesion contracts are consumer contracts, which the PMA is not, and that Southeastern had adequate bargaining power.  Because summary judgment is denied on other grounds, this line of argument will not be addressed.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation to former rule omitted); Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family*

*Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). Only if the factual dispute is "genuine," however, must the court view the facts in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Estate of Garczynski v. Bradshaw*, ___ F.3d __, 2009 WL 1929191, at *6 (11th Cir. 2009) ("The requirement to view the facts in the nonmoving party's favor extends only to 'genuine' disputes over material facts.").

If the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than

9

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (The plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is may be granted in favor of the moving party. *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

### A.     CP's Claims for Breach of Contract

CP asserts two arguments why Southeastern's debranding was not justified and repayment is required under the contract. First, CP argues that because it reserved the right

to rebrand, Southeastern's decision to debrand because of that rebranding was not justified. And second, CP argues that even if the rebranding was not permitted under the PMA, Southeastern's debranding was premature because CP had not yet required it.  CP's alternative argument is that the FARs require repayment of unamortized incentive payments, whatever the reason for debranding, because the repayment clause contains no exceptions. Repayment is required *regardless* of whether a Southeastern's debranding was justified.

It is Southeastern's position, however, that CP, not Southeastern, breached first by forcing a new payment scheme on Southeastern as part of the rebranding effort.  CP breached because, in addition to rebranding, it required Southeastern to accept new payment terms. These new incentive provisions were not subject to negotiation and required Southeastern to abandon the prior incentive terms, which *had* been negotiated with respect to the Auburn and Lincoln facilities.  Unilaterally requiring the new payment terms, Southeastern claims, amounted to anticipatory repudiation, which thereby freed Southeastern from its obligation to perform under the contract and permitted it to debrand without repercussion.[16]

### 1.    The Contract Terms

CP argues that the PMA, with the incorporated FARs, is an airtight contract that authorized CP's conduct.  Under Alabama law, the intention of the parties controls how a

---

[16] Southeastern did not frame its defense in these words, but its defense is tantamount to a repudiation or anticipatory repudiation defense.  Southeastern's counterclaim for estoppel can also be interpreted as touching upon an anticipatory repudiation defense.

written contract is construed.[17]  *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So. 2d 18, 24 (Ala. 2002).  The intention of the parties is derived from the contract itself, "'where the language is plain and unambiguous,'" but if the contract is ambiguous, it is necessary to "consider the surrounding circumstances and the construction the parties gave the language" to determine their intent.  *Id.* (quoting *Loerch v. Nat.'l Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993)).

Whether a contract is ambiguous is a question of law for the court to decide.  *Ohio Cas. Ins. v. Holcim (US), Inc.*, 548 F.3d 1352, 1356 (11th Cir. 2008) (*per curiam*) (applying Alabama law).   When the contract is ambiguous, the finder of fact resolves the ambiguity but only if the court cannot reach a resolution by employing rules of contract construction. *Mega Life & Health Ins. v. Pieniozek*, 516 F.3d 985, 992 (11th Cir. 2008) (*per curiam*) (applying Alabama law).  Terms in a contract are ambiguous "'when given the context, the term[s] can reasonably be open to different interpretation by people of ordinary intelligence.'"  *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898 (11th Cir. 2009) (applying Alabama law) (quoting *Lambert v. Coregis Ins. Co.*, 950 So. 2d 1156, 1162 (Ala. 2006)); *see also Ohio Cas. Ins. Co.*, 548 F.3d at 1356 ("'A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning.'" (quoting *FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc.*, 914 So. 2d 344, 357 (Ala. 2005))).  The parties cannot "create ambiguities by setting forth different

---

[17] The assumption is that Alabama law applies to the contract dispute.  The parties' briefing assumes this application.

interpretations or '[by inserting] . . . strained or twisted reasoning.'" *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 898 (brackets in original) (quoting *Twin City Fire Ins. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 692 (Ala. 2001)).  The parties' intent "'is discerned from the whole of the contract,'" and words are given "'their ordinary, plain, and natural meaning'" unless used in a "'special or technical sense.'" *Extermitech, Inc. v. Glasscock, Inc.*, 951 So. 2d 689, 694 (Ala. 2006) (quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000)).

The PMA unambiguously reserves the right for CP to rebrand and protects against liability for any changes related to the rebranding.  Whether CP may also *change the terms of payment* when rebranding, however, poses a different question.[18]  Indeed, when asked at oral argument under what authority CP could unilaterally change the FARs' payment terms, CP's counsel highlighted a provision under the PMA that was not the provision that permitted CP to rebrand.  The provision counsel referenced requires marketers to "comply with the provisions of Conoco's Incentive Programs, set forth on Conoco's website, ConocoNet.com, which is incorporated herein by this reference, and which Conoco may revise from time to time at its sole discretion."  (PMA ¶ 7.A.)  CP did not include these provisions from the website in support of its motion for summary judgment.  The court lacks the information to determine whether ¶ 7.A refers to a website link that allowed CP to unilaterally change the payment terms.

---

[18] CP's argument that it was permitted to rebrand and that Southeastern's debranding was thus not justified, is incomplete for this reason.  CP was requiring more than debranding; it was demanding unilaterally a change in payment terms.

In fact, without evidence to the contrary, it is unambiguous that this provision does *not* permit CP to adjust the payment terms. "Terms of a written instrument should be construed *in pari materia* and a construction adopted that gives effect to all terms used." *Sullivan, Long & Hagerty v. S. Elec. Generating Co.*, 667 So. 2d 722, 725 (Ala. 1995). A court should interpret a contract's various terms in a way that reconciles any potentially inconsistent parts if they are "susceptible" of reconciliation. *Id.* Paragraph 7.A cannot be interpreted in the way CP asserts because of ¶ 7.C. Under ¶ 7.C, "the provisions of all [FAR] forms entered into between Marketer and Conoco prior to the date of this Agreement and related to Incentive Program *payments* on Approved Retail Outlets that are still a part of this Agreement *shall remain in full force and effect* and be a part of this Agreement." (PMA ¶ 7.C (emphases added).) The 2002 PMA renewal occurred after the parties executed the Lincoln and Auburn FARs so they remained in full force and effect. It would be inconsistent to require marketers to submit to unilateral changes of the payment terms, particularly those that are unfavorable to the marketer, under ¶ 7.A, but contract for the FARs to remain in full force and effect under ¶ 7.C. The former would gut any meaningful effect of the latter. A reasonable interpretation that reconciles the provisions is that the incorporated website provisions, whatever they may be, *supplement* the program terms but leave the FARs meaningfully intact.

Even if the rules of contract construction could not resolve ¶ 7.A's ambiguity, however, the trier of fact would need to resolve the ambiguity. And "[i]t is a well-established rule of contract construction that any ambiguity in a contract must be construed against the

14

drafter of the contract," which in this case is CP.  *SouthTrust Bank v. Copeland One, L.L.C.*, 886 So. 2d 38, 43 (Ala. 2003).

Consequently, either because the PMA unambiguously does *not* permit CP to unilaterally change the incentive payment terms, or because the contract is ambiguous at best on this issue, CP cannot rely on the contract at summary judgment to justify the payment component of the new plan.  More facts are needed on the website provisions and other related matters.  Thus, there is a genuine issue of material fact as to whether CP was permitted to unilaterally change the incentive payment terms and whether CP's insistence upon the new payment plan would have constituted a breach.

### 2.    *Anticipatory Repudiation*

CP argues that it should prevail, however, regardless of whether the new plan was consistent with existing contracts because the plan was never required or implemented, and if the plan was never required, CP never repudiated the contract and Southeastern was not justified in debranding when it did.  Southeastern, on the other hand, contends that CP's actions amounted to an anticipatory repudiation of the contract which justified debranding and freed Southeastern from its contractual obligations.

Anticipatory repudiation occurs when a party "'repudiates a duty before [it] has committed a breach by non-performance and before [it] has received all of the agreed exchange for it.'"  *Dunkin' Donuts of Am., Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1583 (11th Cir. 1992) (quoting *Restatement (Second) of Contracts* § 253(1) (1979)); *accord City of Fairfax, Va. v. Wash. Metro. Area Transit Auth.*, 582 F.2d 1321, 1325 (4th Cir. 1978) (cited

by *Dunkin' Donuts of Am. Inc.*, 956 F.2d at 1582 n.50) (describing anticipatory repudiation as one party "declar[ing] in advance that [it] will not perform at the time set for [its] performance").  "If a party 'wrongfully states that he will not perform unless the other party consents to a modification of the contract, the statement is a repudiation,'" and if an indication of an unwillingness to perform is stated "in terms of future performance," the repudiation is anticipatory.  *Congress Life Ins. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001) (quoting E. Allan Farnsworth, *Contracts* § 8.21, at 635).

For conduct to constitute anticipatory repudiation, "the acts 'must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of [the] obligation.'"  *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 805 (Ala. 1999) (internal quotation marks omitted) (quoting *Draughon's Bus. Coll. v. Battles*, 50 So. 2d 788, 790 (Ala. Civ. App. 1951)).  The repudiation must substantially impair the value of the contract, which is a question of fact.  *Simcala, Inc. v. Am. Coal Trade, Inc.*, 821 So. 2d 197, 203 (Ala. 2001).

"The general rule with respect to repudiation is that when a party repudiates a contract, the nonrepudiating party is discharged from its duty to perform."  *Beauchamp v. Coastal Boat Storage, LLC*, 4 So. 3d 443, 451 (Ala. 2008); *accord Simcala*, *Inc.*, 821 So. 2d at 203 (citing Ala. Code § 7-2-610(c) (adopted from the Uniform Commercial Code) (Anticipatory repudiation allows the aggrieved party to "suspend [its] own performance.")); *Shirley v. Lin*, 548 So. 2d 1329, 1334 (Ala. 1989) ("Once a party to a contract repudiates the agreement, the other party is excused from further performance."); *Cox Nuclear Pharmacy,*

16

*Inc. v. CTI, Inc.*, 478 F.3d 1303, 1315-16 (11th Cir. 2007) (quoting *Shirley* for anticipatory repudiation).  "To require the nondefaulting party to continue the discharge of his contractual duties, in face of a clear, unequivocal repudiation of the contract by the defaulting party, is a senseless requirement that unduly penalizes the nondefaulting party."  *Rosenfeld v. City Paper Co.*, 527 So. 2d 704, 705 (Ala. 1988).  The contract is treated as rescinded.  *Pearce v. Hubbard*, 135 So. 179, 181 (Ala. 1931) ("[T]he party injured by the repudiation of a contract to be performed in the future may treat the contract as rescinded . . . ."); *Birmingham News Co. v. Fitzgerald*, 133 So. 31, 32 (Ala. 1931) ("[O]ne party may so wrongfully repudiate the contract as to authorize the other to renounce it and refuse to be longer bound thereby."); *Admiral Fin. Corp v. United States*, 378 F.3d 1336, 1344 (Fed. Cir. 2004) ("[A]n injured party is entitled to rescission only if the defendant repudiated the contract or committed a total breach." (citing *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000))); *see Mobley v. N.Y. Life Ins. Co.*, 295 U.S. 632, 638 (1935) (characterizing an unqualified refusal that amounts to repudiation as allowing the aggrieved party to treat the contract as "absolutely and finally broken").  Indeed, the nonrepudiating party "is relieved from performing *any* further contractual obligations." *HealthSouth Rehab. Corp. v. Falcon Mgmt. Co.*, 799 So. 2d 177, 183 (Ala. 2001) (*per curiam*) (emphasis added).[19]  An anticipatory repudiation, however, may be withdrawn before the other party manifests an intent to treat the agreement as over. *Dunkin' Donuts of*

---

[19] Under Alabama law, anticipatory repudiation is not a defense for breach of a unilateral contract.  *Rosenfeld*, 527 So. 2d at 704.  The contract in this case is bilateral.

17

*Am., Inc.*, 956 F.2d at 1583 (citing *Restatement* § 256 (Repudiation is "nullified by the retraction of the [repudiating] statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.")).

In *Shirley*, the Alabama Supreme Court summarized the rules governing anticipatory repudiation and repudiation as follows:

> "To amount to a renunciation, . . . the evidence must show words or acts evincing *an intention to refuse performance* within the future time allowed by the contract.
>
> ". . . 'Merely because a given act or course of conduct of one party to a contract is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be . . . bound by it.'
>
> ". . . .
>
> "'Repudiation, among other things, means rejection, disclaimer, renunciation, or even abandonment.' . . .
>
> "Some authorities state that the repudiation by one party 'must at least amount to an *unqualified refusal*, or declaration of inability, substantially to perform according to the terms of his obligation.'"

548 So. 2d at 1334 (emphases in original) (quoting *Draughon's Bus. Coll.*, 50 So. 2d at 790). The court found sufficient evidence to support a jury's finding that one doctor's "insistence" that the other either find a new job or agree to a new payment scheme, based on production rather than salary, constituted "an 'unqualified refusal' to perform the terms of the prior agreement." *Id.* During the trial, the aggrieved doctor had testified that the new payment scheme was "non-negotiable" and that the breaching doctor insisted that he accept the new terms or leave. *Id.* Similarly, in *HealthSouth Rehabilitation Corp.*, the court found sufficient evidence of repudiation to sustain a jury verdict against HealthSouth because there was

18

evidence that it refused to move forward on an agreement without a new condition being met. 799 So. 2d at 183.  *See also Congress Life Ins. Co.*, 799 So. 2d at 938 (noting that the plaintiff could have asserted a theory of recovery based on anticipatory breach because of the other party's letter stating it was unwilling to perform in the future under the terms of the policy unless the plaintiff executed a waiver-of-benefits endorsement).

An attempt to modify a contract *absent* a refusal to perform under the unmodified terms, however, may not amount to repudiation.  *See Cunningham*, 727 So. 2d at 805 ("The allegations of [the] complaint would suggest that the May 3, 1993 letter, was not an 'unqualified refusal' to perform under the contract, but an attempt to modify it.  Nothing in the allegations indicates that the letter was intended to state that [the contracting party] was refusing to perform a previous commitment."  The complaint had alleged only that the letter "attempted to change the terms of the fee arrangement.").

The factual determinations relevant to Southeastern's anticipatory repudiation defense include: (1) whether CP communicated an unqualified refusal to honor the FARs; (2) if so, whether that refusal substantially impaired the value of Southeastern's contract with CP; and (3) whether the refusal nevertheless was withdrawn before CP scrapped the new marketing plan and before Southeastern materially changed its position.  There must be sufficient evidence on all three of these issues for Southeastern to survive summary judgment.

It is undisputed that after Conoco and Phillips merged in 2002, CP announced a new marketing plan at its national meeting that designated Phillips as the only CP brand that

would be used for distribution and sale in the southeast.  It is also undisputed that the MSA

would have replaced existing PMAs.

The Powerpoint presentation CP developed to promote its new marketing plan

informed marketers that they "must go to the new [CP] contract to participate in the new

incentive."  (Powerpoint presentation: "Building our Branded Business to Thrive in a

Changing Industry," Slide 65 (Win the Future Meeting, July 16, 2003: "Program Details")

(Pl.'s Evidentiary Submission Ex. 10).)[20]  The slide titled "New Contract" projected that the

"[n]ew incentive program and contract [would] begin rollout no later than Jan 2004, with

contract review by council subteam in the fall."  (Powerpoint presentation 72.)  Also, a letter

dated March 12, 2004, from Michael O'Connor of CP to its branded marketers lists

"numerous critical dates" including March 31, 2004, "the final date that Marketers [could]

execute the new Branded Marketer Agreement and the [MSA] in order to receive retroactive

reimbursement for the 1st Quarter, 2004."  (O'Connor Ltr. (Def.'s Evidentiary Submission

Ex. 10).)  Another date is June 30, 2004, "the deadline for Branded Marketers to submit their

Oasis re-imaging schedule," *i.e.*, the scheduling for the new marketing plan.  (O'Connor Ltr.)

In his deposition, Pitts testified to numerous conversations with CP representatives

after the plan's announcement in which they discussed his dissatisfaction with the Phillips

brand and the "economics" of giving up the special incentive plans under the FARs.  (Pitts

---

[20] This slide also stated, however, that "[e]xisting program monies will continue per agreements
unless voluntary switchover."  (Powerpoint presentation 65.)  This statement seems to complicate if not
conflict with Pitts's interpretation of the MSA, but Parks testified, in addition to Pitts, that Southeastern
would have been required to give up its special branding incentive program (Parks Dep. 20-21).

Dep. 72.)  It was Pitts's understanding of the new plan that he was required to accept new payment terms (Pitts Dep. 69), and Southeastern would have to "give up the monies [it] was receiving from [CP] via the special branding incentive program [CP] gave [Southeastern] in order to encourage [Pitts] to build the Lincoln and Auburn stores" (Pitts Aff. 6).  Parks's testimony confirms that Pitts correctly understood this aspect of the MSA.  (Parks Dep. 20-21.)

Pitts claims, however, that Southeastern would never have razed and rebuilt the Lincoln and Auburn facilities in the way they were rebuilt without the monies guaranteed by the FARs, and that the monies under the MSA were a "fraction" of the monies under the PMA and FARs.[21]  (Pitts Aff. 6.)  Under the MSA, Pitts contends, CP would have paid the "little" marketers nothing, but the "big" marketers three cents a gallon, and that because Southeastern is "in the middle," it would have qualified for only "a penny."  (Pitts Dep. 85.)  Furthermore, the "only way" that CP could have afforded to pay the "big" marketers three cents per gallon was "to raise [CP's] price in order to be able to offer the rebates going back in."  (Pitts Dep. 85-86.)  In other words, in a "low margin" business like this one, Pitts explained, the only way to pay for the rebate program to the large-volume marketers was "to

---

[21] "Highlights" from the MSA show that the new incentive programs would have been based on a combination of site and total volume, instead of just site volume.  ("New Business Model Highlights and Important Dates" by CP, at 1 (Def.'s Evidentiary Submission Ex. 7).)

raise the rack price on everybody."[22]  (Pitts Dep. 85-86.)  As Pitts stated, "[a]nybody in the gas business understands those economics."  (Pitts Dep. 86.)

When he expressed disagreement with the plan, Pitts testified that CP representatives initially told him they would try to change the program for Southeastern, but as they "started getting back into more deadlines," they represented to Pitts that "everybody [at CP] was saying 'no'" and that the new program was *the* program.  (Pitts Dep. 71.)  At one of the meetings, Pitts said that he was willing to switch to Phillips in Georgia, but that CP's representatives communicated that CP would not budge on Alabama, expressing to Pitts, in his words:  "[W]e are going to Phillips.  We don't give a damn what you do.  If you want to stay with ConocoPhillips you will re-image your store to the Phillips' Oasis program.  We don't care."  (Pitts Dep. 73-74.)  The CP representatives made clear, at least in Pitts's opinion, that the marketers had no choice but to rebrand to Phillips.  (Pitts Aff. 5-6.) Furthermore, Pitts testified that at a meeting around July 2004, he was "told expressly by Mr. Parks that 'I have taken this issue up as high as I can, and there is no turning back.  You have to re-brand to Phillips.'" (Pitts Aff. 6.)  Pitts decided to debrand after that meeting.  As he remembers it, "[b]ased on that final definitive direction from Mr. Parks, and having chased [CP] over this issue for more than a year, I walked away from the meeting and called my brother at [Southeastern] and told him that we were going to de-brand our locations including

---

[22] Pitts assigned an even more nefarious motive to the MSA programs, that CP entered into the MSAs with various companies, and later withdrew them, "to circumvent the requirements of [the] PMPA for withdrawing from a market until [CP] could get [its] image monies redone" (Pitts Dep. 88).

the Lincoln and Auburn locations and re-brand them with our independent brand." (Pitts Aff. 6.)

Eventually, CP scrapped the new marketing plan and MSA, but whether that occurred and was communicated to Southeastern before it debranded is disputed in the evidence. Parks testified that he presented his recommendation to allow dual branding in states like Alabama to CP's marketing leadership team in April or May 2004, and that before December 2004, when he left CP, the company began to permit dual branding in those states, but Parks admitted that he was unclear on what CP's position on dual branding was in July 2004. (*See* Parks Dep. 51-52.) Parks affirmed only that permission to allow dual branding in the southeast was made "somewhere in that time frame of '04.'" (Parks Dep. 53.)

All of this evidence creates a genuine issue of material fact as to whether CP anticipatorily repudiated its agreement with Southeastern. A reasonable factfinder could conclude that CP expressed more than an intention to act inconsistently with the parties' agreement, that CP instead explicitly and unequivocally expressed an intention to repudiate the agreement and force Southeastern to accept a new payment program. Pitts and Parks testified that the new marketing plan and implementing the MSA would replace CP and Southeastern's PMA and FARs. Pitts also testified that CP's representatives repeatedly reiterated that Southeastern had no other option but to accept the new payment terms. The powerpoint presentation can be read to support this contention.

If Southeastern's evidence is to be believed, CP planned to completely abandon the PMA and communicated as much. In this sense, CP's actions parallel those of the

repudiating parties in *Shirley* and *Healthcare Rehabilitation Corp.*  CP's decision appears even more resolute, at least from Southeastern's perspective, in that CP continued to warn Southeastern of the impending new plan after CP representatives attempted but failed to change the plan.  Furthermore, CP allegedly made such representations as late as when the transition implementation deadlines were looming or had passed.[23]

A genuine issue of material fact also exists with respect to whether the repudiation, if found to exist, impaired the value of the contract.  Pitts provided testimony and documentation that the new marketing plan catered to larger-volume marketers, and that Southeastern's position in the market subjected it to a less favorable rebate program than the old special incentive programs.  CP disputes this conclusion, but it can fight this factual skirmish before the jury.

---

[23] The facts of this case differ from another case with similar facts but a different outcome, *BCG, Inc. v. GLeS, Inc.*, No. 07-207, 2008 WL 2856708 (D. Del. July 23, 2008). In *BCG*, owners of retail gas stations sued their fuel wholesaler, who in turn had sued the oil supply company.  *Id.* at *1.  The oil supplier and wholesaler were parties to incentive agreements whereby the former paid the latter based on the amount of gas it purchased for resale at the retailer's locations.  *Id.*  The agreements required the wholesaler to pay back some or all of the incentive payments to the oil supplier in the event the facilities were debranded.  *Id.*  The year before the oil supplier's rights to the brand it was selling were set to expire, the parties tried but failed to negotiate a rebranding.  *Id.*

The wholesaler argued that the contract's requirement that it reimburse the oil supplier in the event of debranding applied only if the wholesaler *wrongfully* repudiated its obligations.  *Id.*  The court found, however, that the contract's "plain language" required repayment "regardless of why . . . debranding occurs."  *Id.* at *3.  The terms of the contract were "unambiguous" in this way.  *Id.* at *4.  Impliedly, then, even if the wholesaler were justified in repudiating the contract and debranding, it owed the oil supplier reimbursement.

Southeastern is claiming instead that CP repudiated the contract *first*, and is thus asserting that the prior repudiation not only justified Southeastern's debranding but also rendered the contract, including the repayment clause, unenforceable against Southeastern.  If CP anticipatorily repudiated the agreement, Southeastern maintains that it was released from those contract terms, no matter how clear the contract was.  The *BCG* opinion is unclear on whether the case included this twist.

Finally, a genuine issue of material fact exists with respect to whether CP retracted its repudiation prior to Southeastern's debranding or to any steps Southeastern took in response to the repudiation constituting a material change in position.  It is unclear, based upon the evidence thus far, how the dates for debranding and abandoning the new marketing plan line up.  A trial would flesh out these facts more thoroughly.

If all these factual disputes are at play, CP cannot rely on the contracts' repayment clause alone, at least not at summary judgment.  Because anticipatory repudiation would discharge Southeastern from its obligations under the FARs, CP's argument that "[n]othing in the contracts excuses [Southeastern] from repaying the monies in the event of 'forced' debranding" (Reply 8) would fail.  The argument overlooks the effect of anticipatory repudiation.  Even a crystal clear contract provision can be rescinded by one party's anticipatory repudiation and the nonrepudiating party's justified election to abandon its contractual obligations.[24]

### 3.    Conclusion

CP's motion for summary judgment on its own claims is therefore due to be denied. The PMA does not unambiguously permit CP to unilaterally change the payment terms of the contract.  In response to CP's argument and evidence that Southeastern's debranding was

---

[24] CP also asserts that Southeastern's refusal to repay the monies on the Auburn and Lincoln facilities conflicts with its decision to repay on the other stores.  (Reply 8.)  Neither the PMA nor FARs distinguish between special or standard incentive programs with respect to the repayment clause.  (*See* Reply 8.)  The difference in the plans, however, affects both the counterclaims and whether the new agreement would have substantially impaired the value of the contract.  It is Southeastern's position that CP's new marketing plan *particularly* impaired the facilities subject to the more favorable incentive programs, *i.e.*, the only two facilities that were razed and rebuilt with the special incentive funds.

nevertheless premature, Southeastern has presented sufficient evidence to create a genuine issue of material fact as to whether CP anticipatorily repudiated the contract to justify Southeastern's debranding.  Finally, since anticipatory repudiation remains for the trier of fact to decide, CP cannot rely at this stage on the repayment clause in the FARs because CP's anticipatory repudiation would release Southeastern from that obligation.[25]

B.      **Southeastern's Counterclaims**

Southeastern counterclaimed for fraudulent suppression, fraud in the inducement, estoppel, and a violation of the PMPA.  The first two claims fail for the same reason: Southeastern presented insufficient evidence to create a genuine issue of material fact as to whether CP had plans to abandon the Conoco brand at the time Southeastern rebranded its stores.

Fraudulent suppression is the "suppression of a material fact which the party is under an obligation to communicate."  Ala. Code § 6-5-102.  Fraudulent suppression requires as one of its elements  "'concealment or nondisclosure of material facts.'"  *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005) (quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So. 2d 61, 63 (Ala. 1996)).  Fraudulent inducement entails "misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party."  To establish a claim for fraud, Southeastern

---

[25] This opinion should not be read , however, to declare the parameters of what else in the PMA or FARs could be enforced in the event the trier of fact finds CP anticipatorily repudiated the contract.

must establish, for one, that CP "made a false representation." *AmerUS Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008).

Southeastern claims that when it made the investment to rebrand to Conoco, CP failed to disclose that it intended to, or had plans to, abandon the Conoco brand in the southeast and to require all facilities to rebrand as Phillips.  (Am. Answer 8.)  CP argues, however, that Southeastern has presented no evidence to support a finding that CP had a plan to rebrand at that time.  (Summ. J. Mem. 17.)  When asked at oral argument about the paucity of evidence in support of the counterclaims, Southeastern's counsel conceded there was no evidence of affirmative fraud but insisted that the evidence supported reckless fraud.  The evidence, he argued, is the timeline of events: the new stores went up in late 2002 and in 2003, and the new marketing plan was unveiled in 2003.

The counterclaims assign the fraudulent suppression, however, to the time CP "convinced [Southeastern] to rebrand its stores" and offered the special incentive programs as part of that effort (Am. Answer 8), and limits the fraudulent inducement to the same time period, when Southeastern rebranded its stores and invested its time and money to incur the obligation (Am. Answer 9-10).  The FARs payment programs were agreed upon in 2000 and 2001.  It is arguable, therefore, that the counterclaims only address fraud occurring a few years earlier than May 2003.  In any case, the timeline, without any additional evidence on the merger negotiations or deals, amounts to a mere scintilla of evidence and is speculative.

 As for the counterclaim for estoppel, it is more accurately framed as an affirmative defense.  Indeed, the substance of that counterclaim has been sufficiently addressed in the

analysis on CP's breach of contract claims.[26]  CP argues that Southeastern has not presented sufficient evidence to support equitable estoppel (Summ. J. Mem. 21), but Southeastern's counterclaim is not structured to allege the elements of equitable estoppel, which are (1) misleading communication by the actor with knowledge; (2) reliance on the misleading communication; and (3) material harm to the recipient of the communication if the actor who made the communication acts inconsistently with his earlier conduct, *Smith v. State Farm Mut. Auto. Ins. Co.*, 952 So. 2d 342, 351 (Ala. 2006).  (*See* Am. Answer 10.)  Even if equitable estoppel were the defense, however, Southeastern has presented insufficient evidence that any communication was *misleading* for the same reason that the fraud counterclaims fail: there is insufficient evidence to support a finding that CP had plans prior to the merger to withdraw the Conoco brand.

Southeastern's final counterclaim alleges a violation of the PMPA's notice requirements.  These requirements apply when a franchisor terminates the marketing agreement because of market withdrawal.  If a franchisor determines "in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located," it must give sufficient notice in certain instances.[27]  15 U.S.C. § 2802(b)(2)(E).  Southeastern

_____

[26] The estoppel counterclaim alleges nothing different from Southeastern's defense to CP's claims.

[27] Because the court finds there was no market withdrawal, the notice requirements will not be addressed.  It is also assumed without deciding that it is permissible to otherwise apply § 2802(b)(2)(E) to this relationship and these events.

28

argues that CP's withdrawal of the Conoco brand amounted to a market withdrawal.  (Opp. Br. 24.)

Assuming *arguendo* that CP's actions ever reached the stage of a withdrawal, its actions were not a market withdrawal as contemplated by that statute.  CP refers the court to *Unified Dealer Group v. Tosco Corp.*, 16 F. Supp. 2d 1137 (N.D. Cal. 1998), a case with persuasive reasons for rejecting Southeastern's argument.  (Reply 11-12.)  In *Unified Dealer Group*, the district court rejected a similar argument that a franchisor's insistence that all retail stores rebrand to one brand amounts to withdrawing from the market under the PMPA. *Id.* at 1139, 1142.  The court pointed out that § 2802(b)(2)(E) applies only when there is a withdrawal from "'the marketing of motor fuel through retail outlets.'"  16 F. Supp. 2d at 1142 (quoting the provision).  The franchisor was not withdrawing the marketing of motor fuel from all outlets in a geographic region but was only marketing in that region under a different brand.  *Id.*  Interpreting the PMPA, the court concluded that it was not Congress's intention "to provide a franchisee with a right to market *under a particular trademark*." *Id.* (emphasis added).  To find otherwise would leave a franchisor that wanted to market only under one brand with three choices: (1) to continue marketing fuel under preexisting trademarks; (2) to sell the service stations it wanted to rebrand; or (3) to withdraw from the market altogether.  *Id.*  "There is nothing in the language of the PMPA that suggests, let alone establishes, that Congress intended to so limit the property rights of franchisors."  *Id.* There is no equally persuasive alternative ruling or interpretation on point.  CP's insistence on rebranding did not constitute a market withdrawal under the PMPA.

Accordingly, CP is entitled to summary judgment on Southeastern's counterclaims.

## V.  CONCLUSION

For the reasons stated herein, it is ORDERED that:

(1)     The remaining portion of CP's motion for summary judgment (Doc. # 34) is DENIED in part and GRANTED in part.  The motion is denied as to the unresolved claims in CP's complaint.  It is granted as to Southeastern's counterclaims; and

(2)     Southeastern's counterclaims are DISMISSED with prejudice.

DONE this 17th day of August, 2009.

　　　　　　　　　　　 /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE